We'll call our next case, 22-1319, Green v. U.S. Anesthesia Partners of Colorado, Inc. May it please the court. My name is Kelsey Boehm and I represent the plaintiff, Appellant Dr. Richard Brant Green. Appellant is in front of this court requesting an order that it reverse the district court's entry of summary judgment in favor of defendants and remand the case back to the district court for trial on the merits. The basis for this appeal are straightforward. First, there is significant dispute of material facts precluding summary judgment. Second, the district court... If you're here to argue the facts, can you appeal? Because we normally do not, at this point, address issues of fact. No, Your Honor. The issue with the district court's ruling is that there was a dispute of material facts precluding summary judgment. Okay. Do you want us to re-address the facts? No, Your Honor. We have to accept the facts that the district court found. Is that right? We're not requesting that this court address the facts. What we're requesting is that the correct legal standard be applied and that the conflict and the dispute between those facts be left for the jury's determination. So you agree that we start with the facts the district court found and work from there? That's our baseline? Yes, Your Honor. We can't massage, adjust, change, or revise the facts? Agreed. Okay. And the second basis for the appeal that I was referring to is the district court's failure to afford reasonable inferences in Dr. Green's favor as the non-moving party on summary judgment. What more could they have done? They gave him every chance in the world. He kept falling off. He couldn't get back to the privileges that he previously had, so he couldn't make the rounds. It seemed to me they tried to do everything to help him, and he didn't help himself. Well, Your Honor, with respect to the termination from partnership, the appellees only provided four months for Dr. Green. Four months? I mean, come on. What, put him on two years and keep him on as a full partner? Is that what you're saying? No, Your Honor. I think that the issue is that Dr. Green did, in fact, regain some privileges. Some privileges. He did not regain all of them. That's correct, and there's a dispute. And he lost them again afterwards. That's correct. At some point he lost them, he regained them, and then actually after the demotion from partnership in 2017, Dr. Green was one of the highest performing employees at USAP, working 309 days in a year. Only 220 are required of physician partners. Counsel, could we take a step back, and I'd like for you to situate your arguments really precisely within the two adverse employment actions that the district court considered, and discuss it that way, if that's all right. Yes, absolutely. So starting with the demotion from partnership, and I think your question relates to accommodation, or is it more broad? You can start wherever you like. I just want to make sure that we're treating those discreetly. I appreciate that. Thank you, Your Honor. With the demotion from partnership, the stated basis provided by defendants was that he did not maintain privileges at all of the facilities that he was assigned, and that he did not perform the on-call function. What sets the universe of essential functions in this case? Is it the partner agreement? Yes, Your Honor. Okay, so you don't disagree that the partner agreement on its face describes what the essential functions of the position are for your client? Yes, Your Honor, but there are a few important caveats to consider. With respect to the on-call function, the agreement states that the physicians were required to participate in call if applicable, and the evidence in front of the district court showed that call was not applicable to all physician partners. What was the evidence that supported it wasn't applicable to your client? The dispute comes from the... He admitted that he had to take on-call assignments as a partner, right? He admitted that as a shareholder prior to his medical leave, he did take on-call or take call as a partner. Okay, but his partnership agreement that sets the universe of essential functions wasn't modified, so we're still looking back to that to discern sort of our benchmark, right? Correct, but there is some dispute because at the time that the agreement was entered into, defendants admitted in discovery that he was not assigned to specific facilities to take call. His testimony related to that same time period when he was a shareholder entering into the agreement. So on the one hand, there's evidence that he was not assigned, and on the other hand, he's simply testifying that he did take call. The evidence showed that Dr. Green was a workhorse. He took call at places that many partners refused to go. Were there any other full-time partners without call obligations? Yes, Your Honor. There were? Yes. Can you be specific about where that is in the record? Yes, can you just give me one moment? In the appendix volume 3 at 677, there's an email from Apelli's scheduling manager saying that there are other physician partners within USAP on both sides that do not take call. Right, but not just other physician partners, full partners just like your client. Okay, so what you're just pointing me to would support that proposition. Yes, I believe so, and there are a few other references within the appendix, the same volume at page 668, where there is a discussion relating to full-time physician partners who opt out of night shifts, and then there is an additional reference at pages 705 and 721, listing partners that do not take call or reduce call. And so were these individuals subject to adjustments, changes, reductions from their agreement as partners? Did they have a separate agreement, essentially? Yes, each physician partner had their own agreement, and I think that that is... Could that explain the difference between your client and these other doctors? I don't think it does. I think that the partner agreement was probably the same, where it includes the if applicable language. Right. And so the different physician partners had different terms. Maybe they did not want to take call at one hospital. Do we have a change of the agreement with your client that would cause him to be able to opt out of being on call? In the 2015-2016 timeframe, there was not a change in the agreement. The defendants terminated it. They terminated it just four months after Dr. Green returned from his medical leave, and before he was able to obtain privileges at all of the hospitals. He continued to work... Just to make sure that the facts or the chronology is clear, the partnership agreement was canceled in 2016, and he was terminated in 2018. That's right. And turning to the termination from employment... Before you move on, for purposes of the essential function of on-call rotation, your evidence that supports your position is the email that you just pointed me to. Is that right? The email, I believe there were three or four emails that I had cited referencing that... The emails collectively. Correct. That's it? Concerning other doctors. Is that right? Yes, Your Honor. Because the position here is physician partner, and not all physician partners were required to take calls. Dr. Green's agreement said that participation in on-call rotation for after-hours coverage as developed, if applicable. So it seems to me he would have to have another agreement to adjust or change his baseline agreement. I'm not sure that that's required. The agreement text is ambiguous. There's no definition of what facility or facilities that he's assigned, even though the terms are... So is that your best argument, that there's a vagary in his not being assigned to specific hospitals? So on-call means only to some, maybe, hospitals, but not all? That's certainly one of our arguments, Your Honor. So you've got the on-call, and then you have separate something else, right? The practice privileges? Sorry, what was that? The practice privileges. Are those two separate things? Yes. Okay. And seeing that we are running short on time, I would like to reserve a few minutes for a bubble. Is that all of your questions for now? That's fine. Thank you, Your Honor. Thank you. Good morning, Your Honors. I'm Stephen Moore, counsel for the appellees. I would like to begin by addressing the removal from the partnership position, and I'll discuss termination from employment at the end. He was not... Dr. Green was not qualified to perform the essential functions when the partner position was terminated. Counsel argues in her brief that USAP had the burden of persuasion. That is incorrect. The burden of persuasion is on the plaintiff. The leading case is Hawkins v. Schwann's home service from the circuit. The burden of persuasion on what? On establishing the essential function. You're contending that's not the employer's purview? Let me back up and rephrase to be more clear. The burden for the employer is production, meaning the employer has to say what is the essential function, have some competent evidence to support that. We submit the partnership employment agreement that establishes that. It then becomes a burden of persuasion for the plaintiff to show that that's not true somehow, some way. So they have to show that it's not essential? Correct. They bear the burden of persuasion. And the problem that they have, I'll submit to you the record here of Dr. Green testifying that yes, he understood he had to take call. He had been doing that. He identified all the physicians, all the stuff about if applicable to Dr. Green, he admits it was applicable to him. I'm sorry, Your Honor. I didn't hear what you said. You could just speak up. Oh, I'm sorry. I will. Let me start over on that point. Dr. Green testified that he understood that on-call was applicable to him, that he performed on-call services at various hospitals. And the employer has testified through various witnesses, it's an essential function. It's pointed to the language in the employment agreement. Why is it important? Why is it an essential function? You could literally have one physician report to, say, hospital A, but then there's an emergency at hospital B. You have to be able to go to hospital B to perform anesthesia in an emergency situation. Unfortunately, when Dr. Green had his alcoholism problem and all these hospitals revoked his privileges as well as ambulatory surgery centers, he could no longer perform call just the way I've described it. And that's why he is not qualified. For an ADA claim. And it's important to keep in mind that medical facilities, not USAP, control the privilege-granting process. Could you speak to that a little bit? I'm trying to understand that component. If the discretion is not yours, how does that affect our legal analysis? Well, it's a very important fact. He was not qualified to enter a hospital and perform anesthesia if he didn't have medical staff privileges. The way hospitals operate is that they have practitioners who are employed at various practice groups like USAP. But they have to apply for and obtain medical staff privileges. I'm a lawyer. I can't apply to be a doctor. I didn't go to medical school. But if your medical license is revoked for whatever reason, these hospitals will revoke your medical staff privileges. That is what happened to Dr. Green. And as a consequence, he also was unable to perform call when he did regain, for example, one hospital. I think decided to allow him at some point to regain his privileges. I believe that was St. Joseph's Hospital right here outside of downtown Denver. But the other major hospital system said no, they were not going to allow that. And so your honors had questions for the opposing counsel about the issue of, well, was there other full-time, full-call positions? Did they somehow get this excuse? The answer is no, and I would like to, this is in our brief, there's a trade-off. If you're going to be a partner physician and receive equity in the company, stock in the company, you're going to have to do call. You're being paid a lot more. You're getting equity. That's the trade-off. They had some retiring partners who were on reduced schedules or other situations with people on reduced schedules. They did not earn the same compensation. They did not get the grant of equity. Was there any evidence presented in the district court that the appellant tried to negotiate something with your client to change his partnership status or anything like that? Are you referring after he was removed from the position? Is there any evidence at all? There is evidence that after he was removed and was working for a period of time, my client approached him and said, we would like to give you an agreement where you work your way back into the partnership. He decides to change the language and say, well, he's already a partner, and that was just not acceptable. That was violating the spirit of the terms of what was being proposed to him. So there were some letters about that issue. There was evidence of Dr. Green crossing out things in handwriting that he's a partner and should be given his stop. That was just not acceptable because even at that point, he had not regained all of his privileges. There was still a major health system denying him access to their hospitals. On this issue, I think it's very important. The district judge took the time to, in her decision, actually write, line by line, what was said in the deposition. It's in our brief, too. Did you understand that you were supposed to maintain the staff privileges you had at the facilities that you regularly worked at? Yes, sir. This was a requirement under the contract. Yes, sir. And you were to maintain staff privileges. Yes, sir. In that same deposition, the plaintiff goes on to identify seven hospitals where he had staff privileges, and specifically six where he regularly worked at before he had this problem. After this problem arose and the staff privileges were revoked by the various hospitals and ambulatory surgery centers, 95% of where he had privileges ended. My client, very reasonably, did not fire him from employment. Instead, reassigned him to a lower position, a position where he was paid by the day or by the hour. They didn't just fire him. The 10th Circuit case of Smith v. Midland Brake discusses reassignment as a form of reasonable accommodation. That was a reassignment. Next slide. Did the district court err by not addressing autism and alcoholism separately in understanding the accommodations claim? It's important to keep in mind that at the time of this removal from the partnership position, he had never said he had autism. The diagnosis comes later. So I do believe it was correct that the district judge did not address autism with that claim. It was not brought before. In the district judge, she does address autism and alcoholism later. Next slide. Next slide. I will now address the termination from employment. What happened here was Dr. Green was assigned. He did gain privileges to work at the Medical Center of Aurora. It has two campuses. He was performing anesthesia procedures at the North Campus, if you will. A nurse, not employed by USAP, employed by Medical Center of Aurora, says that she was sexually harassed by Dr. Green. Dr. Green was touching her and making comments in a flirtatious way that he was single. Keep in mind, USAP, my client, wants to perform procedures there, does not want one of its anesthesiologists sexually harassing the staff. Dr. Green is banned by the Medical Center of Aurora from ever going back to work in the North Campus because of this problem. Here he is losing more privileges. And he cannot show that there is some pretext for discrimination, pretext for retaliation. So you're asking us to get to pretext, or you're not making a prima facie argument here? Well, the district court did look at pretext. I'm just saying all of this is true, even if he admits it. I understand, but if we're trying to understand how best to resolve the claim, your position is that we need to reach pretext, that the prima facie case is established here? On the issue of retaliation, I believe the court held that there can't be retaliation on the removal from the partnership because there was no protected activity that preceded that. So there was a finding that there is no prima facie case. And I assume you would like us to affirm that. But as to the termination from employment, the district judge, I believe, assumed the prima facie case was met, but then found there was no liability because there is a failure of proof on the pretext element. And do you agree that the prima facie case is satisfied? Well, on the – as to the second, you know, I'm talking about termination from employment, there was a causal or temporal proximity. You have something – you had a complaint being filed and there's a termination a few weeks later. But the district judge did point out that the process – and there's case law that addresses this – the process to terminate an employee preceded the protected activity. So I contend that the prima facie case was not satisfied because everything was already in motion. But the district judge went one step further and found there's no pretext anyways. I mean, it's not disputed. He himself, Dr. Green himself admits to having touched the nurse. He admits to making comments while doing so. It's undisputed that the nurse complained. It's undisputed that his ability to go work at the north campus of the medical center of Aurora was revoked. All that's undisputed. I have no further comments, but I welcome your report if any other questions exist. Any questions? No, thank you. I think we understand your argument. Thank you. Thank you. Thank you. Counsel, you have a little over four minutes of time left. Just a few points. Opposing counsel had mentioned that the district court did address Dr. Green's autism in the context of the failure to accommodate claim. That's not true. It was just the alcoholism that was addressed in the context of the failure to accommodate claim. There was also a reference to Dr. Green's sexual harassment or alleged sexual harassment. And opposing counsel stated that the process preceded the protected activity, and that's incorrect. Although this lawsuit was filed allegedly after defendants had made the determination to go about the process of letting Dr. Green go, prior to that alleged decision, Dr. Green had filed a charge for discrimination. So the timing there is important. First, there was the charge of discrimination. Then there was the purported decision to start the process for termination. And then there was the filing of the lawsuit. And only after that, 15 days after that, is when Dr. Green was terminated from employment. There was also discussion. And your point is on that last statement? This is in support of the retaliation claim. That only after Dr. Green had filed his charge of discrimination was, well, a number of issues arose. They tried to force him into signing a revised partner track agreement that had inapplicable terms relating to— Well, when did he get—when was he terminated by the hospital for touching the nurse? The north location stopped allowing him to go to that location in late 2018. He was still allowed to perform procedures at other facilities within that hospital group. And that followed the charge of discrimination. But the handling of that complaint was not pursuant to defendant's procedures. And in fact, the Colorado Physician Health Program authored a letter prior to appellees making their decision to terminate him, writing that they did not believe the incident is representative of a larger problem. They noted that he had been diagnosed with autism spectrum disorder, and that Dr. Green appeared genuine in his desire to remedy the situation and move forward. Also important to note that the Colorado Medical Board did not commence proceedings against Dr. Green, his license, due to the complaint. So the evidence that Dr. Green had filed this charge for discrimination, had tried to negotiate this agreement, revised partner track agreement, and appellees argued that he was improperly trying to suggest that he was still a partner. He was preserving his legal claims. He had already filed for his charge for discrimination, and in noting—or in making a number of important revisions, he was preserving his claim in that comment. Okay, so now we're back to the failure to accommodate, right? We're talking about now? Yes, Your Honor. Okay, so what was his plausibly reasonable accommodation that he was requesting? For the—in connection—in 2018. Is that right? Correct. He could have continued to perform procedures at all of the other facilities except for that north location. That doesn't—that doesn't make sense to me. How could that be? He continued to have his license. But he didn't have practice privileges. At only one location. Okay. And he could continue to perform at all of the other locations. That north location, there were a number of physicians within USAP that did not perform procedures there, and he could have continued to work at all of the other hospitals. I see that my time is up, but I'm happy to answer any other questions that you may have. Any other questions? No. Thank you. Thank you. Thank you, counsel, for your helpful arguments. The case will be submitted. Thank you.